IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  1:22-cr-00232-BLW-EPG |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| MARTIN ALFREDO LEIVA LEIVA, | |
| Defendant. | |

### INTRODUCTION

Before the Court is Defendant Martin Leiva Leiva's Motion to Dismiss Due to Unlawful Grand Jury Composition (Dkt. 463). Defendant Oscar Orellana Guevara has joined the motion. The Court held an evidentiary hearing on April 20, 2026. For the reasons stated below, the Court denies the Motion.

### BACKGROUND

On June 22, 2023, a grand jury returned an indictment charging Mr. Leiva Leiva with six counts of Murder in the Aid of Racketeering and one count of Conspiracy to Participate in a Racketeering Enterprise. A second indictment was returned on February 20, 2025, and a third indictment on May 1, 2025. Mr. Leiva

MEMORANDUM DECISION AND ORDER - 1

Leiva now moves to dismiss the Third Indictment on the grounds that the composition of the grand jury violates the Fifth Amendment, Sixth Amendment, and Jury Selection and Service Act (JSSA).

The grand juries responsible for each indictment were drawn from the "Qualified Jury Wheel" pursuant to the Juror Management Plan adopted by the Eastern District of California. Under the Juror Management Plan, the counties in the Eastern District of California are divided into divisions. *Juror Mgmt. Plan* § 1.07 (Feb. 2022), Dkt. 480-1. Within each division, the Jury Administrator first creates the "Master Jury Wheel" by pulling names of potential jurors from voter registration lists and the records of the California Department of Motor Vehicles. *Id.* § 2.01-2.04. A randomized selection of people on this list then receive juror qualification questionnaires. *Id.* § 3.01-3.02. From that selection, the Jury Administrator creates the Qualified Jury Wheel by removing individuals who are disqualified, exempt, or excused for listed reasons. *Id.* § 3.04-3.05. These reasons include a pending felony charge, lack of English-language proficiency, age over 70, active membership in the armed service, and undue hardship. *Id.* § 3.04.

The grand jury that returned Mr. Leiva Leiva's third indictment was summoned in March 2024 and drawn from the Fresno Division Qualified Jury Wheel filled in April 2023. *See AO-12*, Dkt. 355-1 at 3. At the time, according to the 2023 American Community Survey 5-Year Average data, the total jury-eligible

MEMORANDUM DECISION AND ORDER - 2

population in the Fresno Division was (as relevant here) 51.59% white, 4.71%

Black, and 46.07% Hispanic/Latino. *Martin Decl.* ¶ 17, Dkt. 463-1. The Qualified

Jury Wheel was 58.16% white, 2.98% Black, and 43.06% Hispanic/Latino. *AO-12*,

Dkt. 355-1 at 3. The following table sets out these racial demographics in more

detail—though, as described below, both parties quibble with the numbers.

|  | Jury-Eligible Population | Qualified Jury Wheel |
|---|---|---|
| White | 51.59% | 58.16% |
| Black/African American | 4.71% | 2.98% |
| American Indian/Alaska Native | 1.61% | 1.86% |
| Asian | 6.57% | 8.19% |
| Native Hawaiian or Pacific Islander | 0.20% | 0.55% |
| Other Race | 17.90% | 20.53% |
| Multi-Racial | 17.41% | 5.40% |
| Hispanic/Latino | 46.07% | 43.06% |

## ANALYSIS

Mr. Leiva Leiva argues that Blacks and Hispanics were systematically

excluded from the Qualified Jury Wheel, in violation of his Sixth Amendment right

to jury drawn from a fair cross-section of the community, his Fifth Amendment

right to equal protection, and the JSSA. The Court agrees that Blacks and

Hispanics were underrepresented in the jury pool compared to the total jury-

eligible population, but these gaps are marginal and not the result of systemic exclusion. Neither the Constitution nor the JSSA demands perfect racial symmetry in jury selection. *See United States v. Kleifgen*, 557 F.2d 1293, 1296 (9th Cir. 1977). The Court therefore denies the Motion to Dismiss, as set out in detail below.

### 1.  Factual Disputes

Before considering the legal issues, the Court must resolve factual disputes regarding the racial demographics of the jury-eligible population and the Qualified Jury Wheel.

First, Mr. Leiva Leiva's expert witness, Jeffrey Martin, drew from the 2023 American Community Survey (ACS) 5-Year Average data to determine the racial makeup of the jury-eligible population in the Fresno Division. The 2023 ACS data, however, was not released until December 2024, roughly nine months after the grand jury in this case was summoned. The Government disputes the use of these numbers because, even though they accurately reflect the 2023 population, the Clerk's Office did not have access to the information when summoning the grand jury. Another federal court has criticized Mr. Martin for this approach and relied instead on the population data available to the Clerk's Office at the time of jury selection. *See United States v. Cloud*, No. 1:19-cr-02032, 2021 WL 7184483, at *4 (E.D. Wash. Dec. 8, 2021). But the Clerk's Office knowledge of population demographics does not matter for Sixth Amendment purposes. A fair cross-section

claim hinges on objective analysis and does not require a showing of discriminatory intent. *See United States v. Esquivel*, 88 F.3d 722, 725 (9th Cir. 1996). The question is simply how the jury venire compares to the jury-eligible community at large. The 2023 ACS numbers accurately capture this demographic data, so the Court will utilize them for the rest of the analysis.

More persuasively, the Government contends that Mr. Martin used incorrect data when analyzing the makeup of the Qualified Jury Wheel. The AO-12 form provides the racial demographics for the Qualified Jury Wheel, which excludes individuals who were disqualified, exempt, or excused from jury service. Instead of drawing on this information, Mr. Martin took the Master Jury Wheel and excluded only individuals who were disqualified from service, thus bringing back in several thousand exempt and excused jurors. *See Martin Decl.* ¶¶ 22, 24, Dkt. 463-1. In other words, Mr. Martin essentially manufactured his own, more favorable dataset. There is no reason to include these exempt and excused individuals in the analysis when they were not actually part of the jury venire. Accordingly, the Court will use the demographic numbers from the AO-12 form, which were summarized above.

## 2. Sixth Amendment Right to a Fair Cross-Section

The Court now turns to the legal analysis. The Sixth Amendment protects the right to trial by an impartial jury drawn from a fair cross-section of the

**MEMORANDUM DECISION AND ORDER - 5**

community. *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). To establish a prima facie violation, a defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Here, Blacks and Hispanics are distinctive groups in the community, meeting the first requirement. But Mr. Leiva Leiva fails on the second and third *Duren* prongs because he has not shown that the underrepresentation is legally significant or the result of systematic exclusion.

## A. Legally Significant Underrepresentation

The Ninth Circuit utilizes three major statistical tests for assessing underrepresentation in fair cross-section claims: absolute disparity, comparative disparity, and standard deviation. *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1160 (9th Cir. 2014). None is controlling, and each has both advantages and flaws depending on the particularities of the case. *Id.* at 1165.

### i.     Absolute Disparity

Absolute disparity provides a straightforward measure of the difference between the proportionate size of a group in the community and in the jury pool.

*Id.* at 1160-61. This is computed by subtracting the group's percentage in the community from the group's percentage in the jury pool. Until 2014, the Ninth Circuit utilized this test as the sole measure for fair cross-section claims and required an absolute disparity of more than 7.7%. *United States v. Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005), *overruled by Hernandez-Estrada*, 749 F.3d 1154. Absolute disparity is most helpful for analyzing relatively large groups but does not provide much insight about small minorities—and the exclusion of a group that composed less than 7.7% of the population could never give rise to a fair cross-section claim under the former bright-line rule. *Hernandez-Estrada*, 749 F.3d at 1161.

In the present case, Hispanics were 46.07% of the jury-eligible population and 43.06% of the Qualified Jury Wheel, an absolute disparity of 3.01%. This difference is well within the acceptable range. In a grand jury of 23, this represents roughly 0.7 missing Hispanic jurors. And because Hispanics compose nearly half the jury-eligible population, this low absolute disparity strongly indicates that the group's representation is fair and reasonable under *Duren*. *See United States v. Cannady*, 54 F.3d 544, 548 (9th Cir. 1995) ("This court has consistently held that absolute disparities below 7.7% are insubstantial and constitutionally permissible."); *United States v. Smith*, 457 F. Supp. 3d 734, 741 (D. Alaska 2020) (7.57% underrepresentation of American Indians/Alaska Natives); *United States v.*

*Yandell*, No. 2:19-cr-00107, 2024 WL 4700074, at *3 (E.D. Cal. Nov. 5, 2024) (3% underrepresentation of Hispanics/Latinos).

Blacks were 4.71% of the jury-eligible population and 2.98% of the Qualified Jury Wheel, an absolute disparity of 1.73%. Again, this number is far below the traditional threshold for fair cross-section claim—though the measure has limited value because Blacks compose such a small percentage of the population in the Fresno Division.

### ii.   Comparative Disparity

Comparative disparity measures the underrepresentation of a group relative to that group's size in the population. It is calculated by dividing the absolute disparity percentage by the percentage of the group in the total population. *Hernandez-Estrada*, 749 F.3d at 1163. This can more effectively illuminate disparities involving minority groups, but it also risks overstating the underrepresentation of small minorities. *See id.*

The comparative disparity for Hispanics is only 6.99% (absolute disparity of 3.01% divided by population size of 43.06%). This is not cause for concern.

For Blacks, the comparative disparity is much higher: 36.73% (absolute disparity of 2.08% divided by population size of 4.71%). But this still falls within a constitutionally acceptable range, especially since the test tends to exaggerate disparities for groups of this size. *See Smith*, 457 F. Supp. 3d at 743 (comparative

MEMORANDUM DECISION AND ORDER - 8

disparities of 54.49%, 58.39%, and 59.84% found permissible by other circuits for groups composing, respectively, 10.7%, 2.74%, and 1.27% of the population). Under the circumstances, the comparative disparity does not indicate a legally significant underrepresentation.

### iii.    Standard Deviation

The final method for analyzing underrepresentation is standard deviation, which provides a "measure of the predicted fluctuations from the expected value." *Hernandez-Estrada*, 749 F.3d at 1163. In other words, standard deviation calculates the likelihood that demographic divergence is systemic rather than the result of chance. *See id.* The chief problem, as the Second Circuit has observed, is that "the qualified wheel is not the product of random selection. . . . It is irrational to gauge the qualified wheel—an inherently non-random sample—by its potential for randomness." *United States v. Rioux,* 97 F.3d 648, 655 (2d Cir.1996). For this reason, among others, the Ninth Circuit has expressed skepticism about value of standard deviation analysis. *See Hernandez-Estrada*, 749 F.3d at 1163.

The defense expert, Mr. Martin, calculated that the percentage of Hispanics on the Qualified Jury Wheel varies by more than 13 standard deviations from the eligible population. For Blacks, the variance is more than 8 standard deviations. *D.'s Mem.* at 11, Dkt. 463. As explained above, Mr. Martin utilized the wrong data for the Qualified Jury Wheel, so presumably the correct figures are somewhat

lower for Hispanics and higher for Blacks. Regardless, the Court accepts Mr. Martin's conclusion that the deviations have *statistical* significance, but this does not necessarily translate to *legal* significance. *See Hernandez-Estrada*, 749 F.3d at 1165. Given that the absolute and comparative disparities fall within an acceptable range, and in light of the dubious value of standard deviation for analyzing a jury pool, the defense has not shown a legally significant disparity.

In sum, after considering each of the above statistical analyses both individually and holistically, Mr. Leiva Leiva has failed to establish that the representation of Blacks or Hispanics in the jury venire is not fair and reasonable. Both groups are underrepresented, and particularly for Blacks the variance is cause for concern. But the Sixth Amendment does not require perfection. *See Kleifgen*, 557 F.2d at 1296. Although perhaps worthy of investigation, these deviations are too minor to infringe on Mr. Leiva Leiva's right to a jury drawn from a fair cross-section of the population.

### B. Systemic Exclusion

Mr. Leiva Leiva also fails on the third *Duren* prong: systematic exclusion. "To be systematic, underrepresentation must be due to the *system* by which juries were selected." *Hernandez-Estrada*, 749 F.3d at 1165 (cleaned up). This requires the defendant to identify specific aspects of the jury selection process that result in the exclusion of the relevant group. *See id.* at 1165-66.

Mr. Leiva Leiva first contends that the standard deviation analysis in itself demonstrates systemic exclusion. This argument, however, collapses the second and third *Duren* prongs. Standard deviation is a statistical measurement and cannot satisfy the defendant's obligation to identify substantive features of the jury selection system responsible for the underrepresentation.

Mr. Leiva Leiva next argues that Hispanics are systemically excluded because the Clerk's Office does not refill the Master Jury Wheel by October 1 of each year, as required by the Juror Management Plan. This, his expert says, causes the exclusion of 18- and 19-year-olds, who are disproportionately likely to be Hispanic. But, accepting Mr. Martin's analysis at face value, the failure to timely refill the Master Jury Wheel resulted in a decrease of only 1.03% in the number of Hispanic potential jurors on the Qualified Jury Wheel (and Mr. Martin does not calculate the effect on Black jurors). *D.'s Mem.* at 15, Dkt. 463. This does not amount to systemic exclusion, nor does it even explain the relatively small degrees of underrepresentation described above.

### 3. Fifth Amendment Right to Equal Protection

Mr. Leiva Leiva also claims that the exclusion of Hispanic male jurors violates the Equal Protection Clause of the Fifth Amendment. To show a Fifth Amendment violation, Mr. Leiva Leiva must (1) establish his membership in a group that is "a recognizable, distinct class, singled out for different treatment

under the laws, as written or as applied"; (2) prove the degree of underrepresentation "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time"; and (3) prove discriminatory intent. *Esquivel*, 88 F.3d at 725 (quoting *Castaneda v. Partida*, 430 U.S. 482, 494 (1977)).

Mr. Leiva Leiva is a Hispanic male, meeting the first requirement. But he fails on the second prong because the degree of underrepresentation—an absolute disparity of roughly 3%—is not legally significant.[1] The standard for assessing underrepresentation is the same for equal protection and fair cross-section challenges. *Hernandez-Estrada*, 749 F.3d at 1167. Mr. Leiva Leiva's Fifth Amendment claim thus fails for the reasons set out above.

### 4. Jury Selection and Service Act

Finally, Mr. Leiva Leiva argues that the Eastern District of California's Juror Management Plan violates the JSSA. The JSSA encodes the right "to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. To this end, it requires district courts to "devise and place into operation a written plan for random selection of grand and petit jurors." 28 U.S.C. § 1863(a). To succeed on a

---

[1] 3.01% represents the absolute disparity for Hispanics, not specifically Hispanic males. Mr. Leiva Leiva has not provided the demographic information for Hispanic males on the Qualified Jury Wheel or in the general population, so the Court will not do a separate analysis.

MEMORANDUM DECISION AND ORDER - 12

JSSA violation claim, a defendant must show a "substantial failure to comply." *United States v. Nelson*, 718 F.2d 315, 318 (9th Cir. 1983).

The JSSA analysis mirrors that of a fair-cross-section challenge. *See Hernandez-Estrada*, 749 F.3d at 1168. Thus Mr. Leiva Leiva's claim fails because he has established neither legally significant underrepresentation nor systemic exclusion.

## ORDER

THEREFORE, IT IS HEREBY ORDERED that Defendant Leiva Leiva's Motion to Dismiss Due to Unlawful Grand Jury Composition (Dkt. 463) is **DENIED**.

DATED: June 1, 2026

B. Lynn Winmill
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 13