IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>        v.<br><br>MARTIN ALFREDO LEIVA-LEIVA,<br><br>    Defendant. | Case No.  1:22-cr-00232-BLW-EPG<br><br>**MEMORANDUM DECISION AND ORDER** |

## <u>INTRODUCTION</u>

Under the exclusionary rule, evidence seized in violation of a defendant's rights must be suppressed. By prohibiting the use of unconstitutionally seized evidence despite the sometimes-steep social costs, courts deter government misconduct and ensure that the judiciary does not become complicit in abuses. In short, the rule functions to ensure that constitutional protections have meaning.

Mr. Leiva-Leiva moves to suppress three categories of evidence. First, evidence seized pursuant to search warrants and wiretap orders, which he argues were invalid under the Fourth Amendment. Second, statements he made prior to receiving *Miranda* warnings and after what he alleges was an involuntary waiver of his *Miranda* rights. Third, witnesses' photo identifications of him, made in a

manner that, he says, violated his due process rights and California law.

The Court heard oral argument on May 8, 2026. As explained below, the challenges to the search warrants and wiretaps fail as a matter of law, but the Court will hold evidentiary hearings on the *Miranda* and witness identification issues.

## BACKGROUND

The present motions challenge the constitutionality of various actions by law enforcement during a decade-long investigation into MS-13 activity in and around Mendota, California.

### 1. The Warrants

In May 2018, law enforcement officers obtained an initial Title III wiretap warrant, Wiretap 204, for electronic communications of several suspected gang members. This led to several additional wiretaps, including Wiretap 302 of Target Telephone 24, which is challenged here. That wiretap began in July 2018 and targeted the suspected leader of the Parkview MS-13 clique. During the surveillance, officers intercepted communications with Mr. Leiva Leiva, who at the time was known only as "Dark." Based on the content of those calls, law enforcement concluded that "Dark" was the leader of another MS-13 clique. The wiretaps eventually led to the arrest of numerous gang members in August 2018, but Mr. Leiva Leiva was not yet a suspect.

The following year, a cooperator identified Mr. Leiva Leiva as "Dark" and

claimed that he was the "shot caller" for the Vatos Locos MS-13 clique (VLS) in Mendota. Law enforcement subsequently investigated Mr. Leiva Leiva's travel to El Salvador—where local authorities believed he was an MS-13 member—and wire transfers to family members still living there. In May 2020, based on this investigation and the cooperator's statements, Special Agent Ryan Demmon successfully applied for a search warrant, SW 190, which sought prospective location data from Mr. Leiva Leiva's phone. In late June 2020, Agent Demmon obtained another search warrant, SW 229, for Mr. Leiva Leiva's Facebook records.

## 2.  Initial Interview

In the midst of this investigation, on June 18, 2020, Agent Demmon and other law enforcement officers interviewed Mr. Leiva Leiva in Spanish outside of his home near Richmond, California. Some of the details of the encounter are unclear, and only audio was recorded. Four officers were present, but one may have remained in the car. The officers were armed but did not draw their weapons. Initial questions mainly concerned Mr. Leiva Leiva's immigration status, employment, family and living circumstances, wire transfers to El Salvador, and social media accounts. Agent Demmon then asked if he was part of MS-13. Mr. Leiva Leiva denied any gang associations or being known as "Dark." At Agent Demmon's request, Mr. Leiva Leiva provided a buccal swab for a DNA sample but denied the officers permission to search his home. The interview lasted about 40

MEMORANDUM DECISION AND ORDER - 3

minutes. Mr. Leiva Leiva did not ask to leave, but no one told him during the encounter that he was free to go. He was not read his *Miranda* rights.

### 3. Photo Identifications

The investigation continued for another three years. During proffer sessions in 2022, two confidential sources identified Mr. Leiva Leiva based on a single photograph. Both sources were cooperating witnesses who claimed to have met Mr. Leiva Leiva in person at gang meetings and other social gatherings over the course of several years.

### 4. Arrest and Interrogation

Mr. Leiva Leiva was arrested on June 8, 2023. Law enforcement handcuffed him and drove him three hours to the Fresno County Sheriff's Office, where he was interrogated. Before questioning him, officers removed his handcuffs and provided water. The interrogation room had windows and a couch with a table in front of it. The interviews were conducted in Spanish and recorded on video.

Det. Antunez and Det. Iniguez conducted the first interview, which lasted about two hours. Mr. Leiva Leiva sat on the couch while the detectives sat across from him in chairs. The detectives began with biographical questions about his employment, family, and criminal history. Det. Antunez then read him his *Miranda* rights in Spanish. Mr. Leiva Leiva indicated he understood these rights, and he did not request an attorney or invoke the right to remain silent. The questioning

continued for approximately an hour and 45 minutes, with two breaks of roughly 10-20 minutes. The detectives provided Mr. Leiva Leiva with food during the second break and suggested that he could lie down and rest. At the end of the interview, they took a break for over an hour. During that time, Mr. Leiva Leiva urinated into an empty water bottle, after which officers informed him that he could be taken to the bathroom at his request.

A second, more confrontational interview by Agent Demmon and Det. Antunez occurred next and lasted approximately 20 minutes. Agent Demmon entered the room, where Mr. Leiva Leiva lay on the floor, and kicked the table in front of the couch. Mr. Leiva Leiva moved to a chair, and Agent Demmon sat immediately in front of him, close enough that their knees nearly touched, while Det. Antunez sat slightly back and to the side. Agent Demmon initially spoke English, asking "What do you think is going to happen to you?" He then switched to Spanish and accused Mr. Leiva Leiva of ordering murders in Mendota. Mr. Leiva Leiva denied any wrongdoing.

About two weeks later, Mr. Leiva Leiva was indicted on one count of Conspiracy to Participate in Racketeering Enterprise and six counts of Murder in the Aid of Racketeering. In August 2025, the Government filed its notice of intent to seek the death penalty. Mr. Leiva Leiva now moves to suppress evidence, statements, and identifications produced over the course of the investigation.

## ANALYSIS

Mr. Leiva Leiva has moved to suppress (1) evidence seized in violation of his Fourth Amendment rights, (2) statements made prior to receiving *Miranda* warnings and after an invalid waiver of his *Miranda* rights; and (3) photo identifications by witnesses made in an impermissibly suggestive manner. The Court will address each motion in turn.

### 1. Motion to Suppress Evidence

The Court begins with Mr. Leiva Leiva's request to suppress evidence associated with wiretap and the search warrants, which, he argues, were invalid under the Fourth Amendment.

The Fourth Amendment prohibits unreasonable searches and seizures and requires warrants to be supported by probable cause. At its core, the Fourth Amendment functions to protect "the privacies of life against arbitrary power" and to place "obstacles in the way of a too permeating police surveillance." *Carpenter v. United States*, 585 U.S. 296, 305 (2018) (quotation omitted). A search performed pursuant to a warrant is presumed reasonable, and the burden is on the defendant to establish the warrant's invalidity.

Mr. Leiva Leiva challenges (1) Wiretap 302 for Target Telephone 24, which belonged to an associate of his; (2) Search Warrant 190, which sought his phone location data; and (3) Search Warrant 229, which sought his Facebook records. He

contends that Wiretap 302 was insufficiently particular and inadequately minimized. The search warrants, he argues, were unsupported by probable cause and based on affidavits that contained material omissions made with reckless disregard for the truth.

None of these claims have merit.  First, Wiretap 302 was appropriately particular and adequately minimized. Second, the search warrants for his location data and Facebook records were supported by probable cause. Third, he has not made an initial showing that the affidavits for the search warrants contained reckless and material omissions, so he is not entitled to a *Franks* hearing.

## A. Particularity and Minimization of Wiretap 302

The Court begins with Mr. Leiva Leiva's argument about the unlawfulness of Wiretap 302, which incorporated by reference Wiretap 204. Mr. Leiva Leiva was party to an intercepted communication, so he is an "aggrieved person" under 18 U.S.C. § 2518(10)(a) and may move to suppress the contents of those calls.

Due to the degree of intrusion, wiretaps are subject to particularly strict requirements. Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, a judge may authorize a wiretap only if (1) probable cause exists that someone is committing an enumerated offense; (2) probable cause exists that particular communications concerning that offense will be obtained through interception; (3) normal investigative procedures have been tried and failed or

MEMORANDUM DECISION AND ORDER - 7

reasonably appear unlikely to succeed; and (4) probable cause exists that the target facilities will be used in connection with the offense. 18 U.S.C. § 2518(3). On a motion to suppress, if a wiretap application has satisfied these statutory requirements, the court reviews the issuing judge's decision for abuse of discretion. *US v. Rodriguez*, 851 F.3d 931, 937 (9th Cir. 2017).

The Fourth Amendment and Title III also require wiretap orders to be specific. Specificity contains two dimensions: particularity as to the evidence sought and minimization of the breadth of the surveillance. *See United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006). To satisfy the Fourth Amendment's particularity requirement, a wiretap order must identify "(1) the telephone line to be tapped and (2) the particular conversations to be seized." *United States v. Carneiro*, 861 F.2d 1171, 1179 (9th Cir. 1988). Title III further mandates "a particular description of the type of communications sought to be intercepted, and a statement of the particular offense to which it relates." 18 U.S.C. § 2518(4)(c).

The minimization requirement similarly has both constitutional and statutory aspects. In general, the Fourth Amendment requires "that the scope of the warrant be limited by the probable cause on which the warrant is based." *Hill*, 459 F.3d at 973. And under Title III, a wiretap must "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). Thus, the Government "must adopt reasonable

measures to reduce to a practical minimum the interception of conversations unrelated to the criminal activity under investigation while permitting the government to pursue legitimate investigation." *United States v. Rivera*, 527 F.3d 891, 904 (9th Cir. 2008) (quotation omitted). The Government bears the burden of showing proper minimization. *Id.* When a defendant does not challenge any specific call as improperly minimized, the Government need only make a prima facie case of compliance by showing that it employed "reasonable procedures" to guide its agents. *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990).

Wiretap 302 meets all constitutional and statutory requirements.  As an initial matter, Mr. Leiva Leiva does not appear to contest that the wiretap applications established probable cause and necessity. Nonetheless, the Court notes that the affidavits for both wiretaps showed probable cause that the target was an MS-13 leader who conducted enterprise business over those lines. *See Wiretap 302 Aff.* at 32-36, Dkt. 546; *Wiretap 204 Aff.* at 61-74, Dkt. 546-1. The affidavits also explained in detail why less intrusive investigative techniques were insufficient. *Wiretap 302 Aff.* at 71-106, Dkt. 546; *Wiretap 204 Aff.* at 114-54, Dkt. 546-1.

The wiretaps were also sufficiently particular. Wiretap 302 properly identified Target Telephone 24, the communications that law enforcement sought to intercept, and the racketeering offenses to which those communications related. The wiretaps focused specifically on MS-13's operations in Mendota, and the

affidavits provided details about the organization's structure there and descriptions of local gang assaults and drug trafficking activity. *See Wiretap 302 Aff.* at 25-26, Dkt. 546; *Wiretap 204 Aff.* at 31-34, Dkt. 546-1. With this foundation, the wiretaps could permissibly target a wide-ranging conspiracy in the region. Although a wiretap application must articulate the particular offenses tied to the communications that will be intercepted, the contents of those communications "cannot be known in advance, and the authorizing order need not describe every aspect of the criminal activity expected to be revealed by the surveillance." *United States v. Licavoni*, 604 F.2d 613, 620 (9th Cir. 1979). Thus, an otherwise compliant wiretap order "may be formulated in a manner broad enough to allow interception of *any* statements concerning a specified pattern of crime." *Carneiro*, 861 F.2d at 1179 (quotation omitted). The wiretaps here are examples of this broad but allowable formulation.

Likewise, Wiretap 302 was properly minimized. Mr. Leiva Leiva does not assert that any specific intercepted communications were inadequately minimized, and the Government has met its burden of establishing a prima facie case of compliance. *See Rivera*, 527 F.3d at 904. The affidavit for Wiretap 302 set out minimization procedures, including the requirement that surveillance end when communications appeared unrelated to criminal activity or did not involve targeted individuals and their co-conspirators. *Wiretap 302 Aff.* at 106-09, Dkt. 546.

Prosecutors also distributed a written memorandum to wire monitors with detailed instructions on how to minimize the interception of non-pertinent communications. *See Minimization Mem.*, Dkt. 546-4. These procedures were objectively reasonable, and they mirror procedures approved by the Ninth Circuit. *See Rivera*, 527 F.3d at 904-06; *Torres*, 908 F.2d at 1423-24.

The Court denies Mr. Leiva Leiva's request to suppress wiretap evidence for lack of particularity or inadequate minimization.

### B. Probable Cause for SW 190 and SW 229

The Court next considers whether the search warrants for Mr. Leiva Leiva's location data and Facebook records were supported by probable cause.

Probable cause exists when "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause is "a fluid concept that deals with probabilities and depends on the totality of the circumstances, which cannot readily, or even usefully, be reduced to a neat set of legal rules." *O'Doan v. Sanford*, 991 F.3d 1027, 1039 (9th Cir. 2021) (cleaned up). Though not toothless, the standard "is not a high bar." *Id.*

Mr. Leiva Leiva contends that affidavits for the search warrants contained only "bare bones accusations" insufficient to establish probable cause. *D.'s Mem.* at 7, Dkt. 521. To the contrary, the affidavits—both submitted by Agent

Demmon—contained detailed statements about Mr. Leiva Leiva's criminal activity from a cooperator with a history of providing reliable information. *See SW 190 Aff.* ¶¶ 13-18, Dkt. 546-2; *SW 229 Aff.* ¶¶ 56-63, Dkt. 546-3. The affidavit for SW 190 also stated that Salvadorian law enforcement believed that Mr. Leiva Leiva was an MS-13 member and that he sent money to his sister, who still lived in El Salvador, to further gang activity.[1] *See SW 190 Aff.* ¶¶ 19-20, Dkt. 546-2.

Both affidavits established probable cause. The cooperator's statements are obviously the most important here. "When a search warrant is based solely on an informant's tip, the proper analysis is whether probable cause exists from the totality of the circumstances to determine a sufficient level of reliability and basis of knowledge for the tip." *United States v. Bishop*, 264 F.3d 910, 924 (9th Cir. 2001). In this regard, each affidavit adequately described the cooperator's basis of knowledge and history of reliability. Some of his information was also corroborated, like his description of a murder by machete, which was corroborated by physical evidence, and his statement that Mr. Leiva Leiva lived in Mendota. In short, under the totality of the circumstances, the cooperator's statements showed a fair probability that Mr. Leiva Leiva was engaged in criminal activity. The

---

[1] The Court has concerns about citing these statements by Salvadorian authorities given that country's chilling lack of regard for the due process rights of alleged gang members. *See* U.S. Department of State, *2022 Country Reports on Human Rights Practices: El Salvador*, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/. Although that evidence plays into the totality-of-the-circumstances analysis, probable cause would exist even if the affidavit for SW 190 had left out that information entirely.

MEMORANDUM DECISION AND ORDER - 12

affidavits also appropriately demonstrated the need for, respectively, location tracking and Facebook records.

The Court denies Mr. Leiva Leiva's request to suppress evidence seized pursuant to SW 190 and SW 229 for lack of probable cause.

### C. *Franks* Hearing

Finally, the Court turns to the assertion that Agent Demmon's affidavits contained material omissions made with reckless disregard for the truth.

A warrant may be invalid if the supporting affidavit contains material misstatements or omissions made knowingly or with reckless disregard for the truth. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). "There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant." *Id.* at 171. Thus, a defendant is entitled to a *Franks* hearing to investigate the truthfulness of the affiant only upon a "substantial" preliminary showing that (1) the affiant intentionally or recklessly made misstatements or omissions, and (2) those misstatements or omissions were material to the finding of probable cause. *United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002). When a *Franks* claim stems from omissions, the defendant must show "that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir.), *amended*, 769 F.2d 1410 (9th Cir. 1985).

Mr. Leiva Leiva alleges that Agent Demmon deliberately or recklessly omitted three categories of information from his affidavits for SW 190 and SW 229. The first set of omissions concern the cooperator's motivations to fabricate, including benefits he received for his cooperation (like being moved to a better prison facility), his criminal history, and his immigration status. Second, Agent Demmon failed to specify that Mr. Leiva Leiva was not physically present for the murder of victim J.C. Third, the affidavit omitted a range of exculpatory information about Mr. Leiva Leiva, including that he had no criminal or arrest history; his money transfers to El Salvador were small; his mother in El Salvador was in poor health and needed financial assistance for survival; he had no MS-13 tattoos; and Salvadorian authorities are antagonistic toward citizens from Mr. Leiva Leiva's region of El Salvador.

Mr. Leiva Leiva has not made a sufficient preliminary showing on either *Franks* element. The above omissions appear neither reckless nor material. First, there is no reason to think that the omissions concerning the cooperator's criminal history and benefits received were made recklessly. Agent Demmon's affidavits explained that the cooperator was arrested as part of a gang takedown and that he had admitted to participating in a "gruesome" killing. *SW 190 Aff.* ¶¶ 12, 14, Dkt. 546-2; *SW 229 Aff.* ¶¶ 56, 59, Dkt. 546-3. This provided enough context about the cooperator's criminality that the omission of a detailed criminal history is at most

negligent and does not impact the finding of probable cause. The omission of the cooperator's expected benefits is perhaps more concerning, but a reasonable magistrate would infer that he had struck some sort of deal. *See United States v. Strifler* 851 F.2d 1197, 1201 (9th Cir. 1988) ("It would have to be a very naive magistrate who would suppose that a confidential informant would drop in off the street with such detailed evidence and not have an ulterior motive."). Any error on Agent Demmon's part is immaterial and merely negligent.

Second, Agent Demmon did not meaningfully mislead the magistrate about the nature of Mr. Leiva Leiva's participation in the murder of J.C. The affidavits both stated that Mr. Leiva Leiva was the "shot caller" for VLS in Mendota and lived in Richmond, more than three hours away. *SW 190 Aff.* ¶ 13, Dkt. 546-2; *SW 229 Aff.* ¶ 57, Dkt. 546-3. The affidavits also described Mr. Leiva Leiva as "ordering" a different killing, which occurred outside of his presence, immediately before stating that he "participated" in the killing of J.C. *SW 190 Aff.* ¶¶ 14-16, Dkt. 546-2; *SW 229 Aff.* ¶¶ 59-61, Dkt. 546-3. The implication is that Mr. Leiva Leiva likewise ordered J.C.'s killing without physically taking part. Against this backdrop, the failure to say explicitly that Mr. Leiva Leiva was not present for that murder is negligent at most and immaterial to the probable cause assessment.

Third, there is no indication that the omission of exculpatory information about Mr. Leiva Leiva was reckless or material. For example, he complains of

Agent Demmon's failure to specify that he had no arrest record or MS-13 tattoos. But an affidavit need not catalog these sorts of evidentiary negatives, and such a requirement is wholly unfeasible. *See United States v. Alqahtani*, 73 F.4th 835, 847 (10th Cir. 2023) ("[A] warrant affidavit is not ordinarily required to disclose a source's lack of criminal history."). Other details, like the size of the money transfers to El Salvador, are certainly more pertinent, but the omissions do not rise to the level of recklessness or meaningfully impact the finding of probable cause. These are innocuous oversights and cannot justify a *Franks* hearing.

Given that this is a death penalty case, the Court is inclined to have some leniency toward Mr. Leiva Leiva when evaluating whether to hold a *Franks* hearing. And of course, "[c]lear proof of deliberate or reckless omission is not required" at this preliminary stage. *Stanert*, 762 F.2d at 781. Still, binding precedent from the Ninth Circuit makes clear that Mr. Leiva Leiva must make a "substantial showing" that Agent Demmon's omissions were both reckless and material before the Court can order a *Franks* hearing. The allegations here fail to meet this threshold.

Accordingly, the Motion to Suppress Evidence is denied without an evidentiary hearing.

## 2. Motion to Suppress Statements

The Court next takes up Mr. Leiva Leiva's argument that law enforcement

MEMORANDUM DECISION AND ORDER - 16

violated his *Miranda* rights.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." *Miranda* rights are "a set of prophylactic rules" to safeguard this right against compelled self-incrimination. *Vega v. Tekoh*, 597 U.S. 134, 142 (2022). Under *Miranda*, before commencing a custodial interrogation, law enforcement agents must inform the suspect of the right to counsel and the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). If the suspect waives those rights, the waiver must be done voluntarily, knowingly, and intelligently. *Id.* at 444-45.

Mr. Leiva Leiva contends that (1) he was subject to custodial interrogation during the non-mirandized June 18, 2020, interview outside of his home; (2) he was initially interrogated without receiving *Miranda* warnings after being arrested on June 8, 2023; and (3) his waiver of his *Miranda* rights during the June 8, 2023, interview was not voluntary or intelligent. As set out below, the Court is inclined to exclude only the second category of statements, and the other arguments appear quite weak. Nonetheless, the Court will hold an evidentiary hearing on all of the above claims.

### A. June 18, 2020, Interview

The Court first assesses whether Mr. Leiva Leiva was in custody for *Miranda* purposes during the June 18, 2020, interview.

*Miranda* rights attach only to custodial interrogations. "Interrogation" for *Miranda* purposes refers to "any words or actions . . . that police know or should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "Custody" depends on "whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). The custody assessment, at its heart, asks "whether the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *Id.* at 973-74. For an interview at a suspect's home, courts consider four non-exhaustive factors: (1) the number of officers present and whether they were armed; (2) whether the suspect was restrained at any point, either by force or threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave. *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008).

The Court agrees that Mr. Leiva Leiva was interrogated during the June 2020 interview—law enforcement asked him questions reasonably likely to elicit incriminating information, for instance about his money transfers to El Salvador. He fares far less well on the custody prong. The interview took place outside of his home after officers casually approached and asked if he was willing to talk. The officers did not draw their weapons, raise their voices, or otherwise act

**MEMORANDUM DECISION AND ORDER - 18**

aggressively. The conversation was 40 minutes—not unduly long—and Mr. Leiva Leiva never asked to leave. The Court is highly skeptical that these circumstances could constitute "custody," and few facts appear in dispute.

The Court will, however, order an evidentiary hearing. Unlike in the *Franks* context, this is an area where the Court has discretion. *See United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). Because this is a capital prosecution, Mr. Leiva Leiva should have every opportunity to make his case. If the hearing is a waste of time, it is time well wasted.

### B. Pre-*Miranda* June 8, 2023, Interview

The Court next evaluates the pre-*Miranda* portion of the June 8, 2023, interview following his arrest, which the Government argues falls under the "booking exception" to *Miranda*.

Routine booking questions generally do not amount to interrogation under *Miranda*. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion). This "booking exception" applies to "questions posed to secure the biographical data necessary to complete booking or pretrial services." *United States v. Zapien*, 861 F.3d 971, 975 (9th Cir. 2017) (quotation omitted). Such supposedly neutral information gathering can, however, be abused by law enforcement who use the booking process as a guise to elicit incriminating statements. *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981). Thus the booking exception is

"properly understood as part and parcel of the question whether there has been 'interrogation.'" *Zapien*, 861 F.3d at 975. The core consideration is whether officers knew or should have known that their questions were "reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. Relevant factors include the location of the questioning, the nature of the questions, whether a "true booking" had already occurred, the time elapsed between the questions and the incriminating statements, who conducted the questioning, and whether the officers knew that the questions were related to the crime. *Zapien*, 861 F.3d at 975.

Before providing *Miranda* warnings, Dets. Antunez and Iniguez asked Mr. Leiva Leiva a series of basic autobiographical questions, like his telephone number and address. They then asked about his employment and family, including how he chose his son's name. The Government argues that all these questions fall under the booking exception because the inquiries were not related to the crime or likely to elicit incriminating information.[2] But information about Mr. Leiva Leiva's employment could certainly be incriminating, especially since he was suspected of racketeering. The questions about his family could likewise yield incriminating information about, for instance, his immigration status and continued ties to El Salvador. Further, the "booking" questions were asked in the interrogation room by

---

[2] Detectives also asked several questions about Mr. Leiva Leiva's criminal history, but the Government has conceded that it will not use these in its case-in-chief.

MEMORANDUM DECISION AND ORDER - 20

the same detectives who conducted the main interrogation. All this weighs against the application of the booking exception.

The Court thus tends to agree with Mr. Leiva Leiva that these statements should be suppressed but will reserve ruling until after the evidentiary hearing.

### C. *Miranda* Waiver

Finally, the Court considers the validity of Mr. Leiva Leiva's waiver of his *Miranda* rights on June 8, 2023, which he claims was not intelligent or voluntary.

Waiver of the right to counsel "must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and it must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Rodriguez v. McDonald*, 872 F.3d 908, 921-22 (9th Cir. 2017) (quotation omitted). The prosecution has the burden of proving a valid waiver by the preponderance of the evidence. *Colorado v. Connolly*, 479 U.S. 157, 168 (1986).

Although Mr. Leiva Leiva suggests that his *Miranda* waiver was not done intelligently, the substance of his argument focuses on voluntariness. The voluntariness of a confession hinges on whether a defendant's "will was overbourne." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). For this analysis, courts consider both the suspect's characteristics and the nature of the interrogation—factors such as defendant's education and intelligence, the length of

detention, whether questioning was repeated or prolonged, and conditions of confinement like deprivation of food or sleep. *Id.*

According to Mr. Leiva Leiva, his physical and mental capacity was diminished by the long drive to Fresno, which he spent in shackles, and insufficient food and inadequate bathroom access at the Sheriff's Office. While in this faltering state, Agent Demmon subjected him to an aggressive interview that overcame his will. To exacerbate this vulnerability, law enforcement failed to notify him of his consular rights under the Vienna Convention.

The argument is not very persuasive. Mr. Leiva Leiva was front cuffed on the drive to Fresno to minimize discomfort, and he does not allege that he experienced any mistreatment during transportation. All his basic needs were met during the interrogation. He received *Miranda* warnings in Spanish repeatedly and stated each time that he understood his rights. Agent Demmon's conduct, although aggressive, appears well within constitutional parameters—for example, Agent Demmon did not make specific threats or engage in psychological ploys. Further, that interview lasted only about twenty minutes and occurred after Mr. Leiva Leiva had received a meal and an opportunity to rest. And though he urinated into a bottle because he apparently believed that he did not have access to a restroom, this was a misunderstanding that law enforcement immediately corrected.

In short, the Court does not see any reason to think that the *Miranda* waiver

MEMORANDUM DECISION AND ORDER - 22

was done unintelligently or involuntarily. But, as explained above, the Court will exercise its discretion to hold an evidentiary hearing.

### 3. Motion to Suppress Identification

Finally, Mr. Leiva Leiva moves to suppress identifications by witnesses known as CS1 and CS2, and other currently unknown witnesses. These witnesses were all cooperators who had previously met Mr. Leiva Leiva in person. Law enforcement showed each witness a single unlabeled photograph and asked if it was Mr. Leiva Leiva. He argues that this process violated his due process rights and a California statute governing eyewitness lineups and photo arrays. As detailed below, the Court will conduct an evidentiary hearing to clarify factual issues regarding the witnesses' degree of acquaintance.

The Due Process Clause of the Fifth Amendment limits the use of improperly suggestive identification procedures during criminal investigations. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). A witness's identification violates a defendant's right to due process when the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1969). A court first asks whether the procedure was impermissibly suggestive, then, if so, whether the identification was nonetheless reliable. *United States v. Bagley*, 772 F.2d 482, 492 (9th Cir. 1985).

MEMORANDUM DECISION AND ORDER - 23

To determine whether a procedure is improperly suggestive, a court must examine the totality of the circumstances. *Id.* Mr. Leiva Leiva points to case law holding that it is typically impermissibly suggestive to show a suspect's photo singly rather than as part of an array. *Stovall v. Denno*, 388 U.S. 293, 302 (1967). The Government responds that this line of cases concerns identifications by strangers, where recollections are particularly prone to distortion by law enforcement. *See Manson v. Brathwaite*, 432 U.S. 98, 112 (1977). As several courts have recognized, concerns about the suggestiveness of a single photo do not generally apply when a witness is already familiar with the suspect. *See United States v. Rogers*, No. 2:22-CR-00064, 2023 WL 4037857, at *4 (D. Nev. May 23, 2023), *aff'd*, 2025 WL 1467436 (9th Cir. May 22, 2025); *United States v. Goldsmith*, No. 17-CR-2051, 2018 WL 1410836, at *4 (N.D. Iowa Mar. 21, 2018); *United States v. Burgos*, 55 F.3d 933, 942 (4th Cir. 1995).

The Court agrees with the Government that these suggestiveness concerns would likely dissipate if the witnesses knew Mr. Leiva Leiva well. The problem is that the record contains minimal information about their degree of acquaintance— only that each witness "had seen him in person on more than one occasion, including at small, intimate gang meetings and social gatherings, over the course of several years." *White Decl.* ¶ 3, Dkt. 538-1. But meeting someone twice, potentially many years before making the identification, is quite different from the

close familiarity contemplated in the above cases. *See Rogers*, 2023 WL 4037857, at *4 (identification by defendant's brother); *Goldsmith*, 2018 WL 1410836, at *4 (identification by witness who had bought drugs from defendant 20 times over six years). The Court is also unclear about what constitutes a "small, intimate gang meeting." Without more information, the Court cannot determine whether the identifications were impermissibly suggestive, or were reliable despite their suggestiveness. The Court will hold an evidentiary hearing to allow Mr. Leiva Leiva to probe these matters.

## **ORDER**

THEREFORE, IT IS HEREBY ORDERED that:

1. An **evidentiary hearing** on Defendant Leiva Leiva's Motion to Suppress Statements (Dkt. 519) will be held on **August 10, 2025**.

2. An **evidentiary hearing** on Defendant Leiva Leiva's Motion to Suppress Identification (Dkt. 520) will be held on **August 10, 2025**.

3. Defendant Leiva Leiva's Motion to Suppress Evidence (Dkt. 521) is **DENIED**.

DATED: June 15, 2026

B. Lynn Winmill
U.S. District Court Judge