IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MARTIN ALFREDO LEIVA-LEIVA,

Defendant.

CASE NO. 1:22-CR-00232-BLW-EPG

**AMENDED MEMORANDUM DECISION AND ORDER**

## INTRODUCTION

"Death is different." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). The irrevocability and violence of capital punishment necessitate unique legal restrictions and vest courts with a gatekeeping role that does not exist in typical criminal prosecutions. These constraints on capital punishment are both substantive and procedural. Substantively, the death penalty is limited to the most serious sub-class of murders—the proverbial "worst of the worst." *See Kennedy v. Louisiana*, 554 U.S. 407, 447 (2008). Procedurally, the death penalty must be imposed in a manner that guards against the arbitrary and capricious infliction of the punishment, which plagued our legal system for most of the twentieth century.

*See, e.g.*, *Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980).

The Government seeks the death penalty against Defendant Martin Alfredo Leiva Leiva for six murders in aid of racketeering allegedly committed while he led an MS-13 clique in Mendota, California. According to the third superseding indictment and informational outline, he ordered the murders of a series of rival gang members, suspected informants, and witnesses from January 2016 to December 2017. Lower-level MS-13 members physically carried out these murders while Mr. Leiva Leiva resided several hours away.

Mr. Leiva Leiva brings several challenges to the Government's decision to seek the death penalty. Most importantly, he argues that § 3591(a)(2) of the Federal Death Penalty Act (FDPA), which sets out the threshold intent factors that can justify a death sentence, allows capital punishment only for defendants who physically participate in a murder. Relatedly, he seeks to dismiss the indictment for failure to state a claim, and he requests access to the confidential grand jury transcript because the Government must have misled the grand jury about the evidence or legal standard. He also moves to strike many of the Government's statutory and non-statutory aggravating factors.

The Court holds that the Government may pursue the death penalty here, but only on the theory that Mr. Leiva Leiva "intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force

would be used." *See* 18 U.S.C. § 3591(a)(2)(C). The other threshold factors are inapplicable to command murder. The Court therefore strikes the notice of intent with regard to threshold factors § 3591(a)(2)(A), (B), and (D). The Court declines, however, to dismiss the indictment because this deficiency does not appear within the four corners of the document. The Court also declines to order the disclosure of the grand jury transcript because the novel § 3591(a)(2) issues addressed here do not create an inference of Government misconduct. As to the aggravating factors, most are properly alleged at this stage, but the Court strikes the "substantial planning and premeditation" aggravator as to Victim 4, and the Government may argue the "grave risk of death" aggravator as to Victim 3 only in the alternative to the "multiple killings" aggravator as to Victim 4.

## BACKGROUND

Mr. Leiva Leiva was indicted in June 2023 on one count of Conspiracy to Participate in Racketeering Enterprise and six counts of Murder in Aid of Racketeering. The third superseding indictment, filed in May 2025, also charges a total of nine alleged co-conspirators in the murder counts.[1] The Government elected to pursue the death penalty only against Mr. Leiva Leiva. A formal notice of intent to seek the death penalty was issued in August 2025.

[1] Seven of those defendants are in custody, and two are fugitives. A tenth co-defendant is charged in the conspiracy count but not on any of the substantive murder counts.

According to the Government, Mr. Leiva Leiva helped lead an MS-13 clique known as "Vatos Locos Salvatruchos" (VLS) in Mendota, California. Mr. Leiva Leiva allegedly held the rank "Homeboy," meaning that he had power over clique members in three lower tiers—"Paro," "Observacion," and "Chequeo." As a "shot-caller," he directed the clique's activities in Mendota but lived several hours away in Richmond, California. The Government contends that he ordered or authorized the six charged murders but acknowledges that he did not physically participate in any of the killings.

Pursuant to the FDPA, the third superseding indictment contains a "Notice of Special Findings," which sets out the applicable 18 U.S.C. § 3591(a)(2) gateway factors for each murder victim. Dkt. 369 at 2. The notice lists the following factors:

- "[I]ntentionally killed Victim 1, Victim 2, Victim 3, Victim 4, Victim 5, and Victim 6. 18 U.S.C. § 3591(a)(2)(A)."
- "[I]ntentionally inflicted serious bodily injury that resulted in the death of Victim 1, Victim 2, Victim 3, Victim 4, Victim 5, and Victim 6. 18 U.S.C. § 3591(a)(2)(B)."
- "[I]ntentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Victim 1, Victim 2, Victim 3, Victim 4, Victim 5, and

Victim 6 died as a direct result of the act. 18 U.S.C. § 3591(a)(2)(C).”

- “[I]ntentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than a participant in the offense, such that participation in the act constituted a reckless disregard for human life, and Victim 1, Victim 2, Victim 3, Victim 4, Victim 5, and Victim 6 died as a direct result of the act. 18 U.S.C. § 3591(a)(2)(D).”

The Notice of Intent to Seek the Death Penalty alleges the same threshold factors. Dkt. 369 at 2. The Notice also sets out the following statutory aggravating factors with regard to each murder:

- Victim 1: (a) “The death, or injury resulting in death, occurred during the commission or attempted commission of an offense under 18 U.S.C. § 1201”; (b) the defendant committed the offense “in an especially heinous, cruel, or depraved manner”; and (c) the defendant committed the offense “after substantial planning and premeditation.” *Id.* at 2.
- Victim 2: (a) the defendant committed the offense “in an especially heinous, cruel, or depraved manner”; and (b) the defendant committed the offense “after substantial planning and premeditation.” *Id.* at 2-3.
- Victim 3: (a) the defendant “knowingly created a grave risk of death to

one or more persons in addition to the victim of the offense"; (b) the defendant committed the offense "after substantial planning and premeditation." *Id.* at 3.

- Victim 4: (a) the defendant committed the offense "after substantial planning and premeditation"; and (b) the defendant "intentionally killed more than one person in a single criminal episode." *Id.*
- Victim 5: (a) "The death, or injury resulting in death, occurred during the commission or attempted commission of an offense under 18 U.S.C. § 1201"; (b) the defendant committed the offense "in an especially heinous, cruel, or depraved manner"; and (c) the defendant committed the offense "after substantial planning and premeditation." *Id.*
- Victim 6: (a) "The death, or injury resulting in death, occurred during the commission or attempted commission of an offense under 18 U.S.C. § 1201"; (b) the defendant committed the offense "in an especially heinous, cruel, or depraved manner"; and (c) the defendant committed the offense "after substantial planning and premeditation." *Id.* at 3-4.

Finally, the Notice alleges the following non-statutory aggravators pursuant to 18 U.S.C. § 3593(a)(2): (1) leadership in a transnational criminal organization, (2) multiple killings, (3) future dangerousness, (4) victim impact, and (5) participation in additional uncharged crimes of violence. Dkt. 329 at 4-5.

Mr. Leiva Leiva moves to strike the Notice of Intent and to strike various specific aggravating factors. Dkts. 555, 557. The Court held oral argument on June 22, 2026. The Court also now takes up Mr. Leiva Leiva's related motion to dismiss the indictment for failure to state a claim and motion for disclosure of the grand jury transcript, which were held in abeyance pending the present ruling.

## ANALYSIS

### A. Motion to Strike Notice of Intent

Mr. Leiva Leiva's request to strike the Notice of Intent hinges on the Government's theory that he ordered the charged murders but was not physically present for the killings. The bulk of his motion concerns the meaning of 18 U.S.C. § 3591(a)(2), which sets out the threshold intent factors that can support a death sentence. He contends that each factor requires physical participation in the killing and therefore cannot apply to command murder. He also says that he has been arbitrarily singled out for capital punishment because the Government has not pursued the death penalty against any of the actual killers. The Court begins by examining the broader context of § 3591(a)(2) before considering the applicability of each gateway factor in turn. Finally, the Court briefly addresses the argument that the death penalty is being arbitrarily sought.

#### 1. The Structure of § 3591(a)(2)

Congress passed the Federal Death Penalty Act in 1994 as Title VI of the

Violent Crime Control and Law Enforcement Act. Section 3591(a)(2) sets out four statutory intent factors that can justify a death sentence. These factors function as a "gateway" or "threshold" in capital prosecution. Thus a defendant can be sentenced to death only if he:

> (A) intentionally killed the victim;
>
> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
>
> (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
>
> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act[.]

18 U.S.C. § 3591(a)(2)(A)-(D).

If the jury finds one or more of these threshold factors, the jury must also find at least one statutory aggravating factor—an issue discussed further below—then weigh the aggravating factor(s) against mitigating factors before imposing a death sentence. *See* 18 U.S.C. § 3592. Through this scheme, Congress effectuated the Supreme Court's mandate that "a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988); *see, e.g.*, *United States v. Lawrence*, 735 F.3d 385, 418

(6th Cir. 2013).

An initial question is the relationship between § 3591(a)(2) and the general federal statute on aiding and abetting, 18 U.S.C. § 2(a). Section 2(a) states that a person who commands, or otherwise aids or abets, a federal offense "is punishable as a principal"—a rule that abolishes the distinction between principals and accessories. *Standefer v. United States*, 447 U.S. 10, 19 (1980). If § 2(a) applies to capital cases, Mr. Leiva Leiva could receive the death penalty for commanding a capital murder. But § 3591(a)(2) clearly creates a distinct framework for aiding and abetting that supersedes § 2(a). Mr. Leiva Leiva's death eligibility turns on the meaning of the FDPA, not a non-capital criminal provision.

By enacting § 3591(a)(2), Congress sought to codify the Supreme Court's rulings in two landmark cases on the constitutionality of capital punishment for defendants who do not kill: *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987). Both cases involved defendants sentenced to death under state felony murder laws. Neither man killed, intended that life would be taken, or contemplated the use of lethal force. In *Enmund*, the defendant was the getaway driver for a robbery that resulted in two killings. In *Tison*, the defendant helped his father violently break out of prison then rob and carjack a family, who the father then killed. The Supreme Court held that Enmund's death sentence was unconstitutional because the Eighth Amendment prohibits the death penalty for a

defendant "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Enmund*, 458 U.S. at 797. In *Tison*, the Court narrowed this rule to allow the death penalty for felony murder when the defendant's participation is "major" and he exhibits "reckless indifference to the value of human life." 481 U.S. at 158. The FDPA incorporates these holdings into statutory intent factors (C) and (D). *See* H.R. Rep. 103–466 (March 25, 1994).

Mr. Leiva Leiva's case does not map neatly onto *Enmund* or *Tison* because he allegedly did intend that the victims would die. Command murder prosecutions are rare at the federal level, and few courts have grappled with the gateway factors in this scenario. In fact, the only decisions this Court can locate exclusively address factor (D). Part of the reason for this lack of case law, the Court suspects, is an informal consensus among both prosecutors and defense attorneys that factors (A) and (B) do not apply to command murder, but (C) does. Out of six command murder prosecutions under the FDPA, the Government appears to have pursued the death penalty under (A) and (B) in just one. *See United States v. Davis*, 2:94-cr-00381 (E.D. La.).[2] And in a case charging the defendant with both command murders and hands-on murders, the Government argued all four factors for the

[2] The jury sentenced Davis to death only under gateway factor (C). *See Findings on Intent*, *Davis*, 2:94-cr-00381, Dkt. 523. After his sentence was vacated for unrelated reasons, the Government again sought the death penalty pursuant to (A), (B), and (C). Dkt. 744. Davis was again sentenced to death, but the second jury's findings on the gateway factors are not immediately clear from the record.

hands-on murders but only (C) for the command murders. *See Am. Sent'g Phase Jury Inst.* at 12-15, *United States v. Savage*, 2:07-cr-550 (E.D. Pa. May 27, 2013), Dkt. 1410. Conversely, the Government alleged factor (C) in all six cases, and no defendant appears to have challenged the propriety of that.[3]

Of course, these are exercises of prosecutorial discretion. That the Government chose to only pursue (C) and (D) does not mean that it lacked the power to pursue (A) and (B). And the defendants' failure to challenge factor (C) does not mean that such a challenge is without merit. Still, this practice provides context for the task of statutory interpretation, to which the Court now turns.

### 2. Interpreting the Gateway Factors

When interpreting a statute, courts must begin—and usually end—with the statute's plain meaning. *See United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989). Plain meaning is holistic: "[t]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809 (1989). And typically "courts must construe a statute 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *In re Saldana*, 122 F.4th

---

[3] In addition to *Davis* and *Savage*, see *Fourth Superseding Indictment*, *United States v. Baskerville*, 3:03-cr-00836 (D.N.J. June 29, 2006), Dkt. 82 (factors (C) and (D)); *Notice of Intent*, *United States v. Moonda*, 1:06-cr-00395 (N.D. Ohio Sept. 6, 2006), Dkt. 14 (factors (C) and (D)); *Notice of Intent*, *United States v. Basciano*, 1:05-cr-00060 (E.D.N.Y. May 8, 2007), Dkt. 294 (factors (C) and (D)); *Notice of Intent*, *United States v. McBean*, 1:24-cr-541 (S.D.N.Y. June 6, 2025), Dkt. 119 (factors (C) and (D)).

333, 342 (9th Cir. 2024).

*i. Factor (A)*

The first gateway factor applies when a defendant "intentionally kills the victim." A common dictionary definition of "kill" is "cause the death of."[4] In the most literal sense, a command murder meets this definition because the defendant's conduct causes the victim's death, albeit through the action of a third party. But this definition makes no sense in light of the rest of § 3591(a)(2). Such a broad definition of "kill" would encompass the language of factors (B) and (C), rendering those provisions superfluous. Reading the statute as a whole, the plainest meaning of "kill" is the commission of a death-causing act. This is murder as we most commonly understand it—shooting, stabbing, or poisoning someone, for instance. It does not describe a defendant who asks someone else to kill a victim. *See United States v. Bowers*, 498 F. Supp. 3d 741, 747 (W.D. Pa. 2020) (noting that "an aider or abettor could not be liable under the language of (A) and (B)"). Factor (A) is inapplicable to command murder.

*ii. Factor (B)*

The same logic applies to factor (B), as the court in *Bowers* implied. The plainest meaning of "intentionally inflict[] serious bodily injury" is to physically inflict that injury. To read this language as encompassing an order to inflict serious

---

[4] *Kill*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/kill.

bodily injury would unjustifiably expand this provision—a linguistic generosity that is particularly inappropriate in the context of the death penalty. *See Woodson v. North Carolina*, 428 U.S. 280, 305 ("Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."). Factor (B) is inapplicable to command murder.

*iii. Factor (C)*

Factor (C), on the other hand, plainly applies to command murder. Someone who orders a killing "participate[s] in an act, contemplating that the life of a person would be taken." *See United States v. Baskerville*, 491 F. Supp. 2d 516, 522 (D.N.J. 2007). The order to kill is both an act itself and a component of the broader murder scheme, and this leads directly to the death of the victim. Indeed, *Enmund* used this language of "contemplation" and "intent" to distinguish a felony murder accomplice from someone who aids and abets an intentional murder. *See* 458 U.S. at 795 (identifying only three death row inmates "who were sentenced to die *absent a finding that they hired or solicited someone else to kill the victim* or *participated in a scheme designed to kill the victim*") (emphasis added). The core of *Enmund* was whether the defendant intended for someone to die, not whether he physically pulled the trigger. *See id.* at 819 (O'Connor, J., dissenting) ("While the

petitioner relies on the fact that he did not pull the trigger, his principal argument is, and must be, that death is an unconstitutional penalty absent an intent to kill, for otherwise defendants who hire others to kill would escape the death penalty.”). To strike this factor would twist the words’ meaning beyond recognition and contradict the principles set out in *Tison* and *Enmund*.

*iv. Factor (D)*

Factor (D) is the hardest call. To satisfy this factor, the defendant must have “intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person.” A person who orders a killing knows that his speech act creates a grave risk of death. But whether the words in themselves constitute an “act of violence” presents a more difficult question. The two district courts to consider this issue have reached different conclusions. In *Baskerville*, the defendant was sentenced to death for ordering the murder of a witness while in jail. 491 F. Supp 2d at 517. The court held that “ordering a hit” did not constitute an “act of violence” under subsection (D). *Id.* at 521-22. The ordinary meaning of an “act of violence,” the court determined, is “an act that involves the use of physical force.” *Id.* at 522. Further, the language “specifically engage” is narrower than the requirement in subsection (C) that the defendant merely “participate” in the act. *Id.* A defendant who orders a killing participates in that act of violence, but he does not “specifically engage” in it. *Id.* The court struck factor (D) on this basis.

The district court reached the opposite conclusion in *United States v. Basciano*, 763 F. Supp. 2d 303 (E.D.N.Y. 2011). That case involved a mob boss who, like Baskerville, ordered killings while incarcerated. *Id.* at 310. The court concluded that a defendant who orders an act of violence posing a grave risk of death possesses a mental state that can justify the death penalty. *Id.* at 344. "The focus of *Tison* and the FDPA is on the mental state of the defendant," the court explained, "rather than on whether the defendant personally committed the act of violence or was in close physical proximity to the act." *Id.* at 344. To be consistent with this purpose, the court read "specifically engage" to mean that "the defendant personally was aware of and responsible for the type of conduct committed." *Id.* Ordering an act of violence could thus theoretically satisfy factor (D).

This Court is persuaded by *Baskerville*. The words "act of violence" do not plainly include an order to commit an act of violence, and *Basciano*'s analysis speaks more to the question of whether the death penalty could be constitutionally imposed in this situation than to what the actual language of the statute permits. The Government cites *Deligatti v. United States*, 604 U.S. 423 (2025), to argue that a defendant can commit a violent crime without physically participating in the offense. But *Deligatti* was a case about murder by omission—for instance, starvation—when defining a "crime of violence" under 18 U.S.C. § 924(c). For purposes of the categorical approach, the Court concluded that "it is impossible to

deliberately cause physical harm without the use of physical force." *Id.* at 429. But this relatively broad definition of "crime of violence" in the context of a statute banning firearm possession does not necessarily apply to an "act of violence" under the FDPA.

Further, imposing the death penalty on a person who did not intend to kill already represents the outer limits of the Eighth Amendment. A death sentence for someone who exclusively ordered that act of violence, without any physical involvement at all, would introduce a further degree of attenuation that raises serious constitutional concerns. The Court does not intend to minimize the culpability of one who masterminds a crime in a way that demonstrates reckless indifference to human life. But when the defendant lacks the intent to kill, the intervening agency of the person who carries out the crime has significance. *See Enmund*, 458 U.S. at 798 ("The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence' . . . .") Interpreting "act of violence" to require physical participation is both the most natural reading of the statute and a way to avoid a thorny Eighth Amendment question.

Finally, reckless murder under subsection (D) simply does not match the Government's theory of the case. In *Basciano*, the court ultimately struck factor

(D) from the notice of intent because "the Government conceded that the theory of the case . . . is not a reckless-disregard theory, but rather an intent theory." *Id.* (internal quotation marks omitted). In light of this concession, the court held that "the risk of confusing the jury outweighs the minimal benefit of allowing the jury to consider this theory." So too here.

To sum up, in light of *Tison* and *Enmund*, § 3591(a)(2) clearly sets out a ladder of culpability for death-qualifying mental states. Factor (A)—"intentionally kills"—is classic intentional murder. Factor (B)—"intentionally inflicts serious bodily injury"—applies to a brutal beating that results in death. Factor (C)—"intentionally participated in an act, contemplating that the life of a person would be taken"—describes the aiding and abetting of intentional murder. And Factor (D)—"intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death"—characterizes felony murder with reckless disregard to human life under *Tison*. Only factor (C) can apply to a defendant who was not physically present for the killing. The Court therefore strikes threshold factors (A), (B), and (D) from the Notice of Intent. *See* Dkt. 369 at 2.

### 3. Arbitrariness of Decision to Seek the Death Penalty

Mr. Leiva Leiva also asks the Court to strike the Notice of Intent based on arbitrariness. This aspect of his motion centers on an executive order issued in January 2025 stating that the Department of Justice would seek the death penalty

for all capital crimes committed by people in the country unlawfully. Exec. Order 14164 § 1. Somewhat ironically, his chief concern is that the Government has not in fact sought the death penalty for all illegal immigrants charged with capital offenses, including Mr. Leiva Leiva's death-eligible co-defendants.

There are several problems with this argument. In general, a charging decision under the FDPA is an exercise of prosecutorial discretion not subject to judicial review unless there is evidence of a discriminatory or otherwise improper motive. *United States v. McVeigh*, 944 F. Supp. 1478, 1483-84 (D. Colo. 1996). No such evidence exists here. Further, the Executive Order did not issue until after the Government had decided not to seek the death penalty against the other defendants. Although the Government did subsequently "review" those no-seek decisions, it is far from clear that the Government even had power to rescind them. *See United States v. Spurlock*, 782 F. Supp. 3d 987, 1009 (D. Nev. 2025) (holding that judicial estoppel precluded reversal of no-seek decision). Arbitrariness concerns do not arise from the Government's failure to adhere to a policy that did not exist when the relevant decisions were made.

Beyond these concerns regarding the Executive Order, Mr. Leiva Leiva suggests that it is inherently arbitrary to seek the death penalty against him but not the actual killers or other high-ranking members of MS-13 because they are just as culpable as him. The Court rejects the premise of this argument. Individuals who

order the death of many may well be far more culpable than the foot soldiers who carry out the command. And, higher-ranking members of MS-13 may be beyond the reach of the United States legal system. But, putting those observations aside, this type of fine-grained culpability analysis is a question for the jury during the penalty phase. Intra-case disparities are a mitigating factor at sentencing, not a ground for striking the death Notice. *See Pulley v. Harris*, 465 U.S. 37, 50-51 (1984) (rejecting a constitutional requirement of proportionality review). The Court therefore declines to strike the Notice based on arbitrariness.

**B. Motion to Dismiss for Failure to State a Claim**

Next, Mr. Leiva Leiva moves to dismiss the Third Superseding Indictment under Rule 12(b)(3)(B)(iii) based on the same § 3591(a)(2) objections set out in his motion to strike the Notice of Intent.

When a defendant seeks dismissal for failure to state an offense, "the district court is bound by the four corners of the indictment" and must accept all factual allegations as true. *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). The Government's command-murder theory of the case does not appear in the indictment and has emerged instead from a judicial admission and discovery. But the Government could conceivably acquire new evidence and change its theory of the case. Based on where things now stand, striking portions of the Notice is warranted, but a partial dismissal of the Indictment would exceed the scope of Rule

12(b)(3)(B)(iii). This motion is denied.

### C. Motion for Disclosure of Grand Jury Transcript

Along similar lines, Mr. Leiva Leiva seeks to obtain the grand jury transcript on the theory that a capital indictment for crimes he did not physically commit creates an inference of prosecutorial misconduct.[5] Because the Government has never had evidence of his presence during the murders, he says that the Government must have either knowingly permitted witnesses to falsely testify or misled the grand jury about the applicable law.

This argument has no merit. The court may authorize disclosure of a grand jury matter at the request of a defendant only if the defendant "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). As explained at length above, the Court agrees with Mr. Leiva Leiva that gateway factors (A), (B), and (D) are inapplicable to command murder. But this is a novel statutory question that has divided courts. Given the nebulous state of the law, the grand jury's findings on these factors do not give rise to an inference that anything improper happened during the proceedings. What remains is pure speculation, which cannot overcome the presumption of grand jury secrecy. *See United States v. Walczak*, 783 F.2d 852,

[5] The Court grants Mr. Leiva Leiva's Motion for Leave to Supplement Motion to Disclose Grand Jury Transcript (Dkt. 623). In ruling on the disclosure issue, the Court has considered all submissions related to the motion to strike.

857 (9th Cir. 1986). This motion is denied.

**D. Motion to Strike Specific Aggravating Factors**

Finally, Mr. Leiva Leiva moves to strike various statutory and non-statutory aggravating factors from the Notice of Intent because they are impermissibly duplicative or otherwise unlawful. The requirement that a capital jury find at least one statutory aggravating factor ensures that the death penalty is reserved for the narrow class of offenders most deserving of execution. *See United States v. Lawrence*, 735 F.3d 385, 418 (6th Cir. 2013). To preserve the integrity of this process, the charged aggravators may not wholly duplicate each other—a "double counting" that would "skew the weighing process and create[] the risk that the death sentence will be imposed arbitrarily." *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996). However, duplication is construed narrowly and occurs only when one aggravator is fully "subsumed within another." *Allen v. Woodford*, 395 F.3d 979, 1012 (9th Cir. 2005). Thus, aggravators are not duplicative simply because they emerge from the same facts. *United States v. Fell*, 531 F.3d 197, 236 (2d Cir. 2008). Further, an aggravator may permissibly duplicate an element of the underlying offense. *United States v. Higgs*, 353 F.3d 281, 314 (4th Cir. 2003); *see Lowenfield*, 484 U.S. at 246.

Mr. Leiva Leiva contests the following statutory aggravators: "grave risk of death" as to Victim 3; "multiple killings" as to Victim 4; "substantial planning and

premeditation" as to Victims 1-6; and "especially heinous, cruel, or depraved" as to Victims 1, 2, 5, and 6. He also challenges the non-statutory aggravators of "leadership in transnational criminal organization," "multiple killings," and "future dangerousness." The Court analyzes each in turn.

### 1. "Grave Risk of Death" Statutory Aggravator

The Government alleges that Mr. Leiva Leiva killed Victim 3, known as C.E., in a manner that "knowingly created a grave risk of death to one or more persons in addition to the victim of the offense." *See* 18 U.S.C. § 3592(c)(5). This aggravator arises from the killing of a bystander, A.S. (Victim 4), who happened to be present when C.E. was attacked.

Mr. Leiva Leiva first suggests that the grave risk of death aggravator can only apply when the person placed at risk of death survives. This is inaccurate. The aggravator hinges on the defendant's "mental state with respect to persons who were not the intended victims," not the lethality of the conduct. *United States v. Bin Laden*, 126 F. Supp. 2d 290, 300 (S.D.N.Y. 2001); *see also United States v. Bowers*, 498 F. Supp. 3d 741, 751-53 (W.D. Pa. 2020); *United States v. Cheever*, No. 05-10050, 2006 U.S. Dist. LEXIS 14106 at 13 (D. Kan. May 18, 2006). Thus, the fact that A.S. died does not inherently preclude the application of the grave risk of death aggravator as to the killing of C.E.

More compellingly, Mr. Leiva Leiva argues that "grave risk of death" duplicates the multiple killings statutory aggravator—"intentionally killed more than one person in a single criminal episode," 18 U.S.C. § 3592(c)(16)—which is charged as to Victim 4. In essence, the Government alleges that C.E.'s killing is aggravated because that murder created a grave risk of death to A.S., and A.S.'s killing is aggravated because Mr. Leiva Leiva intentionally killed both A.S. and C.E. in the same episode. The Court agrees that if Mr. Leiva Leiva is convicted of both murders, "multiple killings" would subsume "grave risk of death." *See United States v. Gendron*, 800 F. Supp. 3d 503, 511-12 (W.D.N.Y. 2025), *rev'd on other grounds*, No. 25-2570 (slip op.) (2d Cir. July 27, 2026). To hold otherwise would mean that the grave risk aggravator would always apply when the multiple killings aggravator applies—exactly the sort of double counting that impermissibly skews the sentencing process. Additionally, the two theories are logically inconsistent. "Grave risk" reflects a mental state of recklessness, while "multiple killings" requires intentional conduct. *See id.* It cannot be true that A.S.'s killing was both reckless and intentional.

However, if the jury acquits Mr. Leiva Leiva of the murder of A.S., it could properly find the grave risk of death aggravator as to the murder of C.E. In that scenario, the jury would conclude that Mr. Leiva Leiva did not intentionally kill more than one victim, but C.E.'s murder exposed A.S. to a grave risk of death.

Thus, the Court will not strike the grave risk of death aggravator but will allow the Government only to argue it in the alternative to the multiple killings aggravator.

### 2. "Multiple Killings" Non-Statutory Aggravator

The Government also uses multiple killings as a non-statutory aggravator, alleging that Mr. Leiva Leiva "authorized the killings of more than one person, Victims 1 through 6." Dkt. 369 at 4. He seeks to strike this because it duplicates the substantive murder counts and the non-statutory aggravator of "leadership in a transnational criminal organization." Neither complaint is persuasive.

Regarding the substantive murder counts, an aggravator may permissibly duplicate the underlying crime or an element of the offense. *See United States v. Henderson*, 461 F. Supp. 2d 133, 136 (S.D.N.Y. 2006) (rejecting the argument that multiple killings aggravator duplicated three murder charges); *United States v. Higgs*, 353 F.3d 281, 314 (4th Cir. 2003). And the transnational criminal organization aggravator is wholly distinct. Leading a transnational criminal organization does not inherently entail ordering more than one killing. Although the evidence for each aggravator may well overlap, they certainly do not completely subsume one another. *See United States v. Purkey*, 428 F.3d 738, 762 (8th Cir. 2005).

### 3. "Substantial Planning and Premeditation" Statutory Aggravator

The Government alleges that Mr. Leiva Leiva committed all six charged murders "after substantial planning and premeditation to cause the death of a person." *See* 18 U.S.C. § 3592(c)(9). This aggravator requires that the murder was committed with "more than the minimum amount [of planning] sufficient to commit the offense." *United States v. Tipton*, 90 F.3d 861, 896 (4th Cir. 1996). Neither a "general willingness or even eagerness to kill" nor a broad "shoot-on-sight policy" constitute substantial planning. *United States v. Briseno*, 2015 WL 163526, at *10 (N.D. Ind. Jan. 12, 2015); *see United States v. Roman*, 371 F. Supp. 2d 36, 46-47 (D.P.R. 2005).

Mr. Leiva Leiva challenges this aggravator as to each victim. The argument fails for all victims except A.S. The Government alleges that Mr. Leiva Leiva engaged in advanced discussion about the murders of O.A. (Victim 1), J.M. (Victim 2), C.E. (Victim 3), J.C. (Victim 5), and A.A. (Victim 6)—including providing specific reasons and explicit orders for their killings. A jury could reasonably find the substantial planning and premeditation aggravator as to each of these offenses. *See United States v. Savage*, No. 07-550, 2014 WL 4631976, at *5 (E.D. Pa. Sept. 17, 2014), aff'd, 970 F.3d 217 (3d Cir. 2020) ("[O]rdering a hit on a murder victim, as opposed to personally committing the murder, can entail substantial planning and premeditation.").

A.S., however, was not the subject of any discussion. He was simply present as a bystander during C.E.'s murder, and Mr. Leiva Leiva did not even know that he would be there. According to the Government, Mr. Leiva Leiva had a general order to kill any witnesses, which is essentially a "shoot-on-sight policy." As a matter of law, these allegations cannot support the substantial planning aggravator. The Court will strike this aggravator as to A.S., though the Notice may be amended to reallege the aggravator if the Government changes its theory of the case.

**4. "Especially Heinous" Statutory Aggravator**

The Government alleges that Mr. Leiva Leiva murdered O.A., J.M., J.C., and A.A. "in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." *See* 18 U.S.C. § 3592(c)(6). Mr. Leiva Leiva argues that this aggravator cannot apply because he was not present for any of the murders, and the conduct of those who committed the killings should not bear on whether he is sentenced to death.

The especially heinous aggravator can potentially apply to a defendant who does not physically carry out a killing. *See Robinson v. Schriro*, 595 F.3d 1086, 1105 (9th Cir. 2010). But, "[t]here is no vicarious liability for cruelty in capital cases absent a plan intended or reasonably certain to cause suffering." *Id.* (quoting *State v. Carlson*, 48 P.3d 1180, 1193 (Ariz. 2002)). Thus, a jury may find this aggravator only if the evidence shows that the defendant intended, or at least knew,

that the killings he ordered would be carried out in an especially heinous manner. *Id.* The "mere foreseeability" of heinousness does not suffice. *Id.*

Because Mr. Leiva Leiva's only legitimate objections turn on the sufficiency of the evidence, the Government may continue to pursue this aggravator for now. The evidence might show that he knew these particular killings would be carried out in a way that is especially depraved. However, the Court expects to reexamine this issue at trial to ensure that the Government has produced enough evidence to justify the jury's consideration of this aggravator.

**5. "Leadership in a Transnational Criminal Organization" Non-Statutory Aggravator**

As previously mentioned, the Government alleges leadership in a transnational criminal organization as a non-statutory aggravating factor. Mr. Leiva Leiva argues that this aggravator acts as a proxy for his Salvadorian and Latino identity, violating his equal protection rights and creating a risk of unfair prejudice. But gang membership is not a proxy for race. Although MS-13 is generally Hispanic, there are transnational criminal organizations all over the world with members of all races and ethnicities. There is absolutely no reason to think that the Government is pursuing this aggravator because of Mr. Leiva Leiva's race, nor that it will lead to the risk of unfair prejudice.

Mr. Leiva Leiva's other objections are equally uncompelling. He claims that the leadership in a transnational criminal organization duplicates the substantial

planning aggravator, the multiple killings aggravator, and the future dangerousness aggravator. But each of these obviously reflects distinct characteristics. Leading a transnational criminal group does not inherently require premeditated murder or multiple killings, and future dangerousness is a separate, forward-looking consideration. Again, that these might emerge from the same set of facts does not provide a basis for striking any of the aggravators. *See Purkey*, 428 F.3d at 762.

### 6. "Future Dangerousness" Non-Statutory Aggravator

Finally, the Government alleges as a non-statutory aggravator that Mr. Leiva Leiva "is likely to direct and commit criminal acts of violence in the future such that he poses a continuing and serious threat to the lives and safety of others, as demonstrated by, among other things, his leadership role in MS-13; his history of authorizing others to commit violent crimes without his own direct participation; and his demonstrated lack of remorse for the killings he authorized, as evidenced by his words and actions." He seeks to strike this because the only alternative to capital punishment is a sentence of life without parole.[6]

[6] In addition to moving to strike the aggravator, he argues that considering "lack of remorse" as part of a future dangerousness analysis violates his Fifth Amendment protections against self-incrimination. To be sure, the government cannot rely on the fact that Mr. Leiva Leiva exercised his Fifth Amendment rights to prove a lack of remorse. His conduct during and after the killings is, however, permissible evidence. *See United States v. Mikhel*, 889 F.3d 1003 (9th Cir. 2018).

Imprisonment, however, does not eliminate the potential for future danger. Indeed, several other command murder cases under the FDPA involved incarcerated defendants. *See Basciano*, 763 F. Supp. 2d at 310; *Baskerville*, 491 F. Supp 2d at 517. The jury must take into account that Mr. Leiva Leiva would be imprisoned for life, but it could certainly find that he will continue to pose a threat even while incarcerated. *See United States v. Llera Plaza*, 179 F. Supp. 2d 464, 487-88 (E.D. Pa. 2001); *Simmons v. S.C.*, 512 U.S. 154, 163-64 (1994). This aggravator may stand.

In sum, the Court strikes the "substantial planning and premeditation" statutory aggravator as to Victim 4 and will allow the Government to argue the "grave risk of death" aggravator as to Victim 3 only as an alternative to the "multiple killings" aggravator as to Victim 4. In all other respects, the aggravators are properly alleged at this stage.

## ORDER

THEREFORE, IT IS HEREBY ORDERED that:

1. Defendant Leiva Leiva's Motion for Disclosure of Grand Jury Transcript for Third Superseding Indictment (Dkt. 503) is **DENIED**.

2. Defendant Leiva Leiva's Motion to Dismiss Indictment (Dkt. 518) is **DENIED**.

3. Defendant Leiva Leiva's Motion to Strike Aggravating Factors from the Government's Death Notice (Dkt. 555) is **GRANTED IN PART AND DENIED IN PART** as described in this Memorandum Decision and Order.

4. Defendant Leiva Leiva's Motion to Strike Death Notice (Dkt. 557) is **GRANTED IN PART AND DENIED IN PART** as described in this Memorandum Decision and Order.

5. Defendant Leiva Leiva's Motion for Leave to Supplement Motion to Disclose Grand Jury Transcript (Dkt. 623) is **GRANTED**.

DATED: August 5, 2026

B. Lynn Winmill
U.S. District Court Judge