IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MARTIN ALFREDO LEIVA-LEIVA,<br>Defendant. | Case No. 1:22-cr-00232-BLW-EPG<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it Defendant Martin Leiva Leiva's Motion to Suppress Statements (Dkt. 519) and Motion to Suppress Identification (Dkt. 520). The Court heard oral argument on May 8, 2026, and held an evidentiary hearing on August 10, 2026. For the reasons set out below, the Motion to Suppress Identification is denied. The Motion to Suppress Statements is granted with regard to certain statements made prior to the *Miranda* warning during the June 8, 2023, interview. In other respects, the Motion to Suppress Statements is denied.

## BACKGROUND

The following facts were established at the evidentiary hearing.

Mr. Leiva Leiva was identified as a suspect during a multi-year investigation

into MS-13 activity in Mendota, California. The present motions to suppress concern two interviews conducted in 2020 and 2023, as well as photo identifications by cooperating witnesses. In addition to the details of the investigation described below, several aspects of Mr. Leiva Leiva's background are relevant to the suppression analysis.

Mr. Leiva Leiva was born in El Salvador and grew up during a brutal civil war. His father and sisters were killed during the war, and he fled with his surviving family to a refugee camp in Honduras, where he lived until he was about ten years old. He moved to the United States in approximately 2001. In 2018, when law enforcement began investigating the MS-13 presence in Mendota, Mr. Leiva Leiva was living several hours away in Richmond, California.

**1. Photo Identifications**

Following the arrest of dozens of gang members in Mendota, a cooperating witness, R.E., told law enforcement that Mr. Leiva Leiva was the leader of the Vatos Locos Salvatruchos (VLS) clique. Investigators had previously known the VLS leader only by the moniker "Dark."

In 2019, members of the investigatory team showed R.E. an unmarked photo of Mr. Leiva Leiva, and R.E. affirmed that it was the same person. R.E. had previously met Mr. Leiva Leiva more than once at in-person gang meetings. These were lengthy meetings with no more than ten participants, often followed by a

barbecue or other social event.

The Government acknowledges that R.E. was not always truthful. For example, he lied about one of Mr. Leiva Leiva's codefendants stabbing victim J.M. Additionally, in exchange for his cooperation, R.E. received immigration assistance for his family, though no promises had been made in that regard prior to the 2019 identifications. R.E. was sentenced to between five and ten years in prison for his role in VLS.

Mr. Leiva Leiva was subsequently identified by numerous other cooperating witnesses during interviews that took place between 2022 and 2025. Each of witnesses had met Leiva Leiva face-to-face on numerous occasions at gang meetings and social events between 2015 and 2023. The witnesses with the least degree of acquaintance had interacted with Mr. Leiva Leiva in person on roughly six occasions; others had met him dozens or even hundreds of times. Each witness immediately identified him when shown two different unmarked photos.

**2. 2020 Interview**

On June 18, 2020, Special Agent Ryan Demmon and Detective Briana Leon interviewed Mr. Leiva Leiva outside his home in Richmond. They did not provide a *Miranda* warning. Audio, but not video, of the interview was recorded. Two other law enforcement officers were present at a distance, approximately 10 to 30 feet away, close to the street. Agent Demmon asked about Mr. Leiva Leiva's

family, immigration status, and employment. The conversation was cordial. The officers were armed, but their weapons remained holstered. It is not clear whether the weapons were visible. Mr. Leiva Leiva was not handcuffed or blocked from his home, though no one informed him that he was free to leave. He allowed Agent Demmon to take a buccal swab for a DNA test but declined a request to search his home. Agent Demmon and Det. Leon also photographed Mr. Leiva Leiva. The interview lasted about 40 minutes.

**3. 2023 Interview**

Law enforcement arrested Mr. Leiva Leiva on June 8, 2023. He was front-cuffed, placed in leg shackles, and transported several hours by car to the Fresno County Sheriff's Office. There he was unshackled, provided water, and brought to an interrogation room with windows and a couch

Det. Antunez and Det. Iniguez conducted the first interview. Mr. Leiva Leiva sat on the couch while the detectives sat in chairs across from him. Before giving a *Miranda* warning, Det. Antunez asked a series of biographical questions, beginning with Mr. Leiva Leiva's name, date of birth, age, telephone number, and home address. Ex. 8 at 2-3, Dkt. 540-8. He then asked more detailed questions about Mr. Leiva Leiva's employment and family. *Id.* at 3-8. At the evidentiary hearing, Det. Antunez testified that he asked most of these pre-*Miranda* questions for the purpose of filling out an arrest tag, a document filed for all arrestees taken

to the Fresno County Jail. The arrest tag includes name, date of birth, phone number, address, place of birth, employer, occupation, and an emergency contact.

Following the biographical questions, Det. Antunez indicated that he was going to give a *Miranda* warning. Before actually giving the warning, he inquired about Mr. Leiva Leiva's arrest history. *Id.* at 8. The Government has stipulated that it will not use responses to those questions in its case in chief.

Det. Antunez then explained Mr. Leiva Leiva's *Miranda* rights in Spanish. Mr. Leiva Leiva appeared to be alert and paying attention. He initially expressed confusion about the right to remain silent. Det. Antunez explained further, and Mr. Leiva Leiva indicated that he understood. *Id.* at 9. They then transitioned to a substantive interview, which lasted approximately an hour and 45 minutes, with two 10-20 minute breaks. Mr. Leiva Leiva was provided with food and told that he could lie down to rest during the breaks.

After the first round of questioning, they took a break for over an hour. During this time, Mr. Leiva Leiva urinated into an empty water bottle in the interrogation room. When officers realized what happened, they told him that he could be taken to the bathroom at his request.

Agent Demmon then joined Det. Antunez for a second, more confrontational interview. Agent Demmon entered the interview room carrying a chair. He sat close enough to Mr. Leiva Leiva that their legs were almost touching and shoved

the table hard enough for items to fall off. Despite being aware that Mr. Leiva Leiva can only speak Spanish, Agent Demmon's first words were in English: "What do you think is going to happen to you?" *Id.* at 91. The questioning continued aggressively, and Agent Demmon regularly raised his voice. Mr. Leiva Leiva remained submissive. The interview lasted about 20 minutes.

## ANALYSIS

### 1. Motion to Suppress Statements

Mr. Leiva Leiva's motion to suppress statements raises three Fifth Amendment questions. First, was he "in custody" during the 2020 interview outside his home? Second, did the non-*Mirandized* portion of his 2023 interview following his arrest fall within the booking exception to *Miranda*? Third, was his waiver of his *Miranda* rights done knowingly, intelligently, and voluntarily? The Court finds that only certain statements given during the non-*Mirandized* portion of the 2023 interview must be suppressed.

#### A. June 2020 Interview

The Court first assesses whether Mr. Leiva Leiva was in custody for *Miranda* purposes during the June 18, 2020, interview.

*Miranda* rights attach only to custodial interrogations. A suspect who has not been formally arrested can nonetheless be "in custody" if he experiences a "restraint on freedom of movement of the degree associated with a formal arrest."

*United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). The key question is "whether the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *Id.* at 973-74. For an interview at a suspect's home, courts consider four non-exhaustive factors to determine whether the setting became custodial: (1) the number of officers present and whether they were armed; (2) whether the suspect was restrained at any point, either by force or threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave. *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008).

The circumstances here do not come close to the level of restraint associated with a formal arrest. First, although four officers were present—a relatively high number—two of them stayed a distance away. And though the officers had guns, their weapons remained holstered and may not even have been visible to Mr. Leiva Leiva. Second, Mr. Leiva Leiva was not physically restrained or threatened. Third, he was not isolated from others. These three factors all weigh strongly against a finding that he was in custody. On the other side of the ledger is only factor four: he was not told that he could leave. This alone would not make a reasonable person believe that he could not end the interaction. Further, the interview remained cordial the entire time, and it took place in a courtyard outside of Mr. Leiva Leiva's apartment rather than in the home proper—more evidence that a

reasonable would feel that he was free to leave.

Under the totality of the circumstances, Mr. Leiva Leiva was not in custody for *Miranda* purposes during the interview on June 18, 2020. Because his *Miranda* rights did not attach, no violation occurred here.

### B. Pre-*Miranda* June 2023 Interview

The Court next evaluates the pre-*Miranda* portion of the June 8, 2023, interview following his arrest, which the Government argues falls under the "booking exception" to *Miranda*.

"Interrogation" for *Miranda* purposes refers to "any words or actions . . . that police know or should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Routine booking questions—administrative inquiries designed to obtain basic biographical data—generally do not amount to interrogation. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion); *United States v. Zapien*, 861 F.3d 971, 975 (9th Cir. 2017). *Miranda* rights attach, however, if such questions stray into territory likely to lead to an incriminating statement. *See United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981). Relevant factors include (1) the location of the questioning, (2) the nature of the questions, (3) whether a "true booking" had already occurred, (4) the time elapsed between the questions and the incriminating statements, (5) who conducted the questioning, (6) and whether the

officers knew that the questions were related to the crime. *Zapien*, 861 F.3d at 975.

Here, Det. Antunez's initial questions about Mr. Leiva Leiva's name, date of birth, phone number, and home address fall within the booking exception. Although these were posed in the interview room by one of Mr. Leiva Leiva's interrogators, this sort of basic biographical information must be obtained from all arrestees and is not likely to lead to an incriminating response. Indeed, the Court is not clear that the responses even were incriminating.

The questions about Mr. Leiva Leiva's employment and family, however, cross the line into interrogation. Det. Antunez did not simply ask for his employer's name and an emergency contact. When Mr. Leiva Leiva said he delivered products for a nail polish factory, Det. Antunez followed up with detailed questions about the delivery process and company locations. And after asking about Mr. Leiva Leiva's wife, Det. Antunez inquired about their children, including their ages and how Mr. Leiva Leiva picked out their names. There is no purely administrative need for this information. Particularly in light of the investigation into Mr. Leiva Leiva, which looked into money transfers to family members in El Salvador, these questions were reasonably likely to elicit incriminating responses.

The Court finds that a custodial interrogation began when Det. Antunez posed the question, "Do you work?" Ex. 8 at 3. At this point, Mr. Leiva Leiva's

*Miranda* rights attached. The statements made from this time until he received the *Miranda* warning are suppressed.

### C. Post-*Miranda* June 2023 Interview

Finally, the Court considers the validity of Mr. Leiva Leiva's waiver of his *Miranda* rights on June 8, 2023, which he claims was neither intelligent nor voluntary.

Waiver of the right to counsel "must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and it must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Rodriguez v. McDonald*, 872 F.3d 908, 921-22 (9th Cir. 2017) (quotation omitted). The prosecution has the burden of proving a valid waiver by the preponderance of the evidence. *Colorado v. Connolly*, 479 U.S. 157, 168 (1986).

To show that the waiver was done knowingly and intelligently, the Government must prove that the defendant was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The voluntariness of the waiver turns on whether the defendant's "will was overborne." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Relevant factors include the defendant's education and intelligence, the length of detention, whether questioning was repeated or

prolonged, and conditions of confinement like deprivation of food or sleep. *See id.*; *United States v. Preston*, 751 F.3d 1008, 1019-20 (2014).

Mr. Leiva Leiva's waiver was knowing, intelligent, and voluntary. Det. Antunez explained *Miranda* rights accurately and in Mr. Leiva Leiva's native language. When Mr. Leiva Leiva expressed some confusion about the right to remain silent, Det. Antunez paused to clarify, and he confirmed that Mr. Leiva Leiva understood before proceeding. This record establishes that Mr. Leiva Leiva was aware of his rights and the consequences of waiving them.

The Government has also shown that the waiver was voluntary. During the interrogation, Mr. Leiva Leiva received food, water, and several opportunities to rest. Including these breaks, questioning lasted about four hours total, which is not unduly long. Agent Demmon's conduct was somewhat intimidating, but it never came close to crossing a constitutional line. For example, he did not touch Mr. Leiva Leiva or use psychologically coercive tactics.

The Court is mindful that Mr. Leiva Leiva's background might have made him especially vulnerable. His traumatic early life in El Salvador is relevant to the voluntariness inquiry. *See Preston*, 751 F.3d at 1020. But this personal history is not enough to render the waiver involuntary given all the other circumstances. Indeed, Mr. Leiva Leiva's responses show that he remained self-possessed enough to admit to some of Agent Demmon's accusations while denying many others. For

example, he consistently denied gang membership and going by the moniker "Dark," but acknowledged that he had killed his brother in El Salvador. The sophisticated nature of these responses provides strong evidence that his will was not overborne.

The Government has met its burden to prove that Mr. Leiva Leiva's *Miranda* waiver was valid. The Court will not suppress any statements made following the *Miranda* warning.

**2. Motion to Suppress Identification**

The Court now turns to Mr. Leiva Leiva's motion to suppress photo identifications made by approximately ten cooperating witnesses.

The Due Process Clause of the Fifth Amendment limits the use of improperly suggestive identification procedures during criminal investigations. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). A witness's identification violates a defendant's right to due process when the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1969). A court first asks whether the procedure was impermissibly suggestive, then, if so, whether the identification was nonetheless reliable. *United States v. Bagley*, 772 F.2d 482, 492 (9th Cir. 1985).

Normally, it is impermissibly suggestive to show a suspect's photo singly

rather than as part of an array. *See Stovall v. Denno*, 388 U.S. 293, 302 (1967). This rule, however, concerns identifications by strangers—a context where eyewitness recollections are particularly vulnerable to distortion. *See Manson v. Brathwaite*, 432 U.S. 98, 112 (1977). For a witness already familiar with the suspect, showing a single photo is typically not impermissibly suggestive. *See United States v. Rogers*, No. 2:22-CR-00064, 2023 WL 4037857, at *4 (D. Nev. May 23, 2023), *aff'd*, 2025 WL 1467436 (9th Cir. May 22, 2025); *United States v. Goldsmith*, No. 17-CR-2051, 2018 WL 1410836, at *4 (N.D. Iowa Mar. 21, 2018); *United States v. Burgos*, 55 F.3d 933, 942 (4th Cir. 1995).

Here, the evidence shows that the witnesses knew Mr. Leiva Leiva well enough that the use of a single photograph does not violate the Due Process Clause. Each witness, except possibly R.E.,[1] interacted with Mr. Leiva Leiva a minimum of six times—and often far more than that. Further, these interactions were under circumstances that increase the reliability of the subsequent identifications. The witnesses knew Mr. Leiva Leiva from gang meetings that he led and prolonged social events with a small number of attendees. Given this degree of acquaintance, the use of a single-photo identification procedure, even years later, is not so suggestive that it violates the Due Process Clause.

---

[1] R.E. met with Mr. Leiva Leiva face-to-face more than once during out-of-town meetings to discuss gang business. The number of times they met, however, remains unclear.

Finally, the Court takes a moment to address concerns about the credibility of these witnesses raised at the hearing. All of the witnesses are gang members who pled guilty to serious crimes and are expected to receive significant benefits in exchange for their cooperation. At least one witness apparently has a history of lying to investigators. But these credibility issues are a question for the jury, not a basis for the wholesale exclusion of evidence. As the Supreme Court explained in *Perry v. New Hampshire*:

> The Constitution, our decisions indicate, protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit. . . . Apart from these guarantees, we have recognized, state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial. Only when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice," *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal quotation marks omitted), have we imposed a constraint tied to the Due Process Clause.

565 U.S. at 237 (internal citations omitted).

For these reasons, the Motion to Suppress Identification is denied.

## ORDER

THEREFORE, IT IS HEREBY ORDERED that:

1. Defendant Leiva Leiva's Motion to Suppress Statements (Dkt. 519) is **GRANTED IN PART and DENIED IN PART** as described above.

2. Defendant Leiva Leiva's Motion to Suppress Identification (Dkt. 520) is **DENIED**.

DATED: August 13, 2026

B. Lynn Winmill
U.S. District Court Judge